[Cite as *Schultz v. Ciras, Inc.*, 2026-Ohio-2967.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

MARY E. SCHULTZ et al.,

Plaintiffs-Appellees,

v.

CIRAS, INC. et al.,

Defendants-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No.  24 MA 0091**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2023 CV 01170

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Reversed.

---

*Atty. James N. Melfi ,* Betras Kopp, LLC, for Plaintiff-Appellee and

*Atty. Scott C. Essad* and *Atty. Jeffrey J. Sobeck,* for Defendant-Appellant

Dated:  July 30, 2026

**Robb, J.**

{¶1} Defendant-Appellant Ciras, Inc. appeals the decision of the Mahoning County Common Pleas Court entering judgment on a jury verdict in favor of Plaintiff-Appellee Mary Schultz on a strict liability dog bite claim. As argued by Appellant, the evidence presented at trial was not sufficient to show Appellant was a harborer of the dog. Accordingly, the trial court's judgment is reversed, and judgment is entered in favor of Appellant.

<u>STATEMENT OF THE CASE</u>

{¶2} On September 9, 2019, Mary Schultz was bitten by a dog owned by Justin Cadle. Justin's soon-to-be wife, Megan, was also bitten. This pit bull resided with Justin and Megan at 4510 S. Duck Creek Road in North Jackson. Ciras, Inc. owned this property.

{¶3} On May 29, 2020, Mary and her husband Kevin Shultz filed the initial lawsuit against Ciras, Inc., Justin Cadle, Megan Cadle, and John Does. An amended complaint added Daniel Cadle and various companies. Justin and Megan were discharged in bankruptcy. After Ciras, Inc. and other defendants filed a summary judgment motion, the complaint was voluntarily dismissed without prejudice in July 2022.

{¶4} On June 19, 2023, Mary and her husband refiled the complaint against Ciras, Inc., The Cadle Company, Kevin W. Harper Investments, Inc., and Daniel Cadle. The complaint set forth a claim for strict liability under R.C. 955.28 against the owner, keeper, or harborer of the dog. In addition to strict liability and the husband's loss of consortium claim, there was also a negligence claim regarding a vicious dog; however, the plaintiff proceeded only on strict liability. Tr. 35 (Pl. Opening), 315-319 (Pl. Closing), 346-347, 356-358 (Jury Instructions).

{¶5} The trial court granted summary judgment in favor of all defendants except Ciras, Inc. as the owner of the property. (6/20/24 J.E.). The parties then consented to allowing a magistrate to preside over the jury trial.

{¶6} At trial, Mary Schultz testified she often jogged past Justin's house on Duck Creek Road. On multiple occasions, she saw the subject pit bull chained to a tree in front of a structure near the house (she described as a garage or barn). Tr. at 161. However,

on the day of the dog attack, the dog was loose, and it confronted Mary in the road by circling her. Tr. 158. Noting she was a volunteer at an animal shelter where she judged the personality of many pit bulls while walking them, she described the dog's behavior toward her as "very guarded" and said she realized she was in a bad situation. *Id.* at 158. Because the dog took a step every time she did, she decided to walk the dog towards its house. When she arrived at the front porch, she knocked on the door multiple times and yelled for someone to come get the dog. *Id.* at 159-160.

**{¶7}** Megan, who was inside the house, attempted to open the front door but could not open it far enough due to the warped condition of the floor or door. When Megan exited via the back door, the dog left Mary near the front porch and approached Megan. Mary said she started walking back toward the road but then heard Megan screaming and turned to see the dog attacking Megan by biting her arms. *Id.* at 161-162. Consequently, Mary returned and told Megan to calm down and stop yelling. This prompted the dog to switch its attention to Mary who started running.

**{¶8}** Mary testified the dog chased her and bit the back of her thigh after she reached the road. *Id.* at 162-163. The dog then bit Mary's arms and hands as she protected her throat and face. She experienced horrendous pain during the attack, thought the dog was going to kill her, and had "blood all over." *Id.* at 163-164.

**{¶9}** Eventually, emergency responders were able to reach her and took her to the emergency room by ambulance. *Id.* at 165. She required x-rays to ensure there were no embedded teeth. The puncture wounds and scratches were then aggressively cleaned, and she required 17 stitches. *Id.* at 166-167. Photographs were introduced showing the severity of her injuries. She spoke of lingering effects from the attack. *Id.* at 178-183. Her physician's deposition testimony was read into the record by agreement. *Id*. at 128-148. The defense stipulated to Mary's medical bills (in Pl.Ex. 8) as reasonably related to her treatment and directly and proximately caused by the dog bite. *Id*. at 149-50.

**{¶10}** In her testimony, Mary opined Ciras, Inc. was liable because the dog lived on property owned by the company. *Id.* at 188-189, 197. She opined Daniel Cadle was in charge of Ciras, Inc. because she learned his IRA owned a share of the company, and she assumed Daniel knew his nephew had a dog. *Id.* at 188, 195-196. Related to the

topic, on Ciras, Inc.'s possession and control over the property or the common areas such as a field and back barn, she believed a person who cut hay would necessarily need to obtain permission from the titled property owner before doing so. *Id.* at 190.

**{¶11}** The first responding law enforcement officer testified the pit bull was acting extremely aggressive near the front steps of the house when he arrived. *Id.* at 53, 58. Upon exiting his vehicle, the dog came after him. He sheltered in his vehicle, called for backup, and received instructions to euthanize the dog because victims required medical attention. *Id.* at 53-54. Before he could do so, Justin Cadle drove up to the house, summoned the dog into his truck, and later secured it in the building near the house. *Id.* at 54-56.

**{¶12}** The officer described the address of the incident as a two-story home with driveway occupied by Megan and Justin. Tr. 52-53. He estimated the home was 75 to 100 feet from the road. He noticed the dog's chain 15 to 20 feet from the back door of the house. Behind the house was a significant amount of property, including a field with a pole barn. *Id.* at 56-57.

**{¶13}** Justin Cadle was subpoenaed to testify in the case in chief. According to his testimony, he moved into the house on Duck Creek Road in 2018, Megan and their children moved in a few months prior to their November 2019 wedding. *Id.* at 65. At the time of the September 2019 dog bite, the dog's license was current being renewed in Justin's name on January 15, 2019. (Def.Ex. A). He owned the pit bull since 2014, but before moving to this house, Justin lived with his mother while the dog lived with Justin's father. Tr. at 65-66.

**{¶14}** On the day of the dog bite, Justin secured the dog on a 25-foot chain attached to a tree where the driveway ended, but the dog later broke its collar. *Id*. at 84, 87-88. Photographs show the gravel driveway running between the house and a detached garage. Although the garage is slightly set back further from the road than the house, the house and garage are separated by only a two-car driveway (with a thin strip of grass between the house and drive). The driveway stops at the garage area with a large tree marking the end of the driveway; behind the tree is some yard space and then high grass. (Def.Ex. B & C).

{¶15} Regarding his occupancy of the house, Justin testified to attending an auction for the address with his great-uncle, Daniel Cadle. Justin was interested in purchasing the property but could not financially manage the purchase. *Id.* at 69-70. His uncle purchased the property for $128,000 and allowed Justin and his family to occupy it. *Id.* 70, 80. Justin testified he was not charged monthly rent. *Id.* at 70, 75. He was questioned about a May 2020 bankruptcy petition he filed with Megan. When questioned why he answered in the negative when the petition asked if he had any unexpired leases, he noted he did not have a lease or rental agreement. *Id.* at 72. When questioned why he answered in the negative when the petition asked if he owned any legal or equitable interest in a residence or land, he explained he did not yet own the property at the time; he also said the situation was not a land contract. *Id.* at 69, 76. He was questioned why he testified to controlling the property while answering in the negative when the petition asked if he held or controlled property owned by someone else. He noted a bankruptcy attorney helped them fill out of the paperwork and explained: "I did control the property at the time. I didn't own it. I honestly do not remember filling this out to be truthful with you." *Id*. at 82, 95.

{¶16} When asked if he was living in the house under any terms from his uncle, he testified, "Yeah. Fix – fixing the house up to buy it. Yes . . . To make the place presentable, take care of the home, fix it up and make it a home for my family was the terms, really." *Id.* at 86. Justin said he spent $30,000 to make the house livable, and his uncle gave him $10,000 to help him make improvements. *Id*. at 80, 89. As examples, Justin said he fixed the roof, the stairs, the living room, and the dining room. *Id*. at 80. He testified his uncle did not direct him on what to fix (with his uncle's only advice being to save on electric bills by purchasing LED bulbs). *Id*. at 91. He said his uncle did not visit the property except for the auction and did not issue any rules or prohibit him from having a pet, while noting he did not believe his uncle knew he had a dog. *Id.* at 74, 93-94. Justin said at the time, he was unaware the house was owned by a company and no one from the company came to the property, stored anything there, or had keys. *Id.* at 70, 91-92.

{¶17} Justin described the property as consisting of two tracts, with the house sitting on the six-acre tract. *Id.* at 72; *see also* (Pl Ex. 9) (deed to Ciras, Inc. showing 6.69

acres in tract one and 11.649 acres in count two). Justin acknowledged his cousin, who was also a nephew of Daniel Cadle, "was allowed to come on and bale hay and sell it" but was not asked from whom his cousin received permission to cut the field or whether any permission extended to the curtilage of the house. *Id*. at 73.

**{¶18}** Justin was asked about receiving a text in November 2019, two months after the dog bite incident, wherein his uncle asked him if he decided to purchase the house. Justin's reply text answered, "Little late to back out now. You know, yes, I want it. I put all my chips in one pot. And so, yes." His uncle responded by texting, "You can back out any time up to closing. I'm not in a hurry whenever you are ready." *Id*. at 78-79.

**{¶19}** Over a year later, Justin and Megan purchased the property from Ciras, Inc. for approximately the same price it sold for at the 2018 auction. To do so, they signed a February 2021 five-year balloon note and mortgage in favor of Ciras, Inc. *Id*. at 90; (Def.Ex. D) ($126,700 with 1% interest).

**{¶20}** At the end of the plaintiff's case, the defense filed a motion for directed verdict due to the failure to meet the burden to prove Ciras, Inc. was a harborer. It was argued the law does not assume a corporation is liable for a dog bite because it owns the property and there was no evidence Ciras, Inc. possessed or controlled the home where Justin lived. *Id*. at 209, 213. It was argued the law presumes the tenant has possession of the single-family house he occupies, noting a lease agreement need not be written. *Id*. at 209-210, 218, citing R.C. 5321.01. Defense counsel urged control meant the right to admit and exclude people and pointed to law stating a property owner does not control a house merely because he maintains the rights to evict from the property, insure the structure, pay property taxes, make repairs, or inspect the premises. *Id*. at 211-212. The defense pointed out Daniel Cadle was subpoenaed by the plaintiffs and the president of Ciras, Inc. (Thomas Jenkins[1]) was present the entire trial, but the plaintiffs failed to call either to testify on whether Ciras, Inc. retained possession and control during the occupancy of Justin and Megan. *Id*. at 215. It was noted even acquiescence to a dog's presence is irrelevant if the property owner does not have possession and control. *Id*. at 214.

---

[1] The plaintiff's opening statement also noted Mr. Jenkins was present on behalf of Ciras, Inc. and Daniel Cadle was not present. Tr. 34-35.

Case No. 24 MA 0091

{¶21} In response, the other side agreed a landlord/tenant relationship can transfer actual possession and control but opined there was a difference between leasing a house and the situation in this case where the owner lets someone live in a house without a lease. Counsel argued there was no intent to lease, noting no rent was paid, Justin wished to buy the home, and Justin answered in a bankruptcy filing that he had no control over any property. *Id*. at 216. It was claimed receiving $10,000 from Daniel Cadle to make improvements was evidence that Ciras, Inc. controlled the property, as was the evidence of family member Daniel Cadle entering the land to farm. *Id*. at 217.

{¶22} In reply, the defense alternatively argued even if the court refuses to apply the definitions of landlord and tenant in the statute defining the relationship or finds a failure to meet those definitions, this would not make a property owner a harborer of dog, especially where they do not both possess and control the property at the time. *Id*. at 219. It was also pointed out Daniel Cadle gifted the money to his nephew; the money was not provided to Justin by Ciras, Inc. *Id*. at 212.

{¶23} After the trial court overruled the directed verdict motion, the defense presented the testimony of the dog warden. She confirmed Justin Cadle was on record as the dog's owner and the dog's license purchased by him in January 2019 was current at the time of the bite. She said Justin voluntarily surrendered the dog when requested. *Id*. at 241-242. She opined the form that requested the dog owner's name alternatively asked for the name of the dog's harborer in case someone else was in charge of the dog at the time. *Id*. at 246.

{¶24} Megan Cadle testified about: Mary Schultz knocking on the front door and reporting the dog was loose; Megan yelling to say the front door did not work and going to the back door; Mary following the dog around the house; Megan pushing on the dog when he would not respond to her command to get closer to the chain; and the dog first attacking Megan. *Id*. at 256. When the dog let go of Megan's arm, she ran to push her young child from the doorway into the house while the dog went after Mary. She then saw Mary walking backwards with her arms up to protect herself as she reached the road (presumably after the dog bit Mary's leg). Megan believed a neighbor whistled, which distracted the dog so Mary could run into the house with Megan. *Id*. at 259.

**{¶25}** Regarding the property, Megan said the old farmhouse was not livable for two children when Justin moved in; she thus waited until March 2019 to join him in the house. *Id*. at 251. She said the stairs needed replaced, an upstairs window needed fixed, the ceiling was leaking and falling in due to the condition of the roof, and the rooms were filthy and needed paint. In addition, they updated the upstairs bathroom (which had no shower) and constructed a bath/laundry room in an unfinished room on the first floor. *Id*. at 252.

**{¶26}** Megan said Ciras, Inc had no control over the property and no rules or repair instructions; she explained if she wished to paint the house green one day and hot pink the next day, she could do so. *Id*. at 253. As for the $10,000 from Daniel Cadle, she said this was a gift with no strings "to be nice so we can get stuff done and live together" after making the house livable and appealing including getting "our room painted and the girls' room painted so they're not just sleeping on an air mattresses in a dark blue room with no curtains or anything." *Id*. at 255. She said Ciras Inc. did nothing at the property, had no keys, and did not store anything in the garage. *Id*. at 253-254. She had no knowledge as to who allowed Justin's cousin to cut hay at the property. *Id*. at 253, 264.

**{¶27}** The defense then renewed the motion for directed verdict, again stating there was no evidence Ciras, Inc. possessed or controlled the property. *Id*. at 269. In response, the plaintiff's counsel said there was no meeting of the minds to transfer possession and control to the occupants. *Id*. at 270. The court overruled the motion and allowed the case to proceed to the jury. Explaining they would have to find Ciras, Inc. a harborer of the dog by the greater weight of the evidence to find for the plaintiffs, the court instructed:

> A harborer means a person with possession or control of the premises where the dog lives and acquiesces, silently or otherwise, to the dog's presence. Within the meaning of the dog bite statute, the focus should not be on the person's possession and control of the dog, but on the person's possession and control of the premises where the dog is kept.

*Id*. at 346-347.

**{¶28}** The jury rendered a verdict in favor of Mary Schultz and her husband while affirmatively answering the interrogatory asking if Ciras, Inc. was a harborer of the dog. Mary was awarded $32,000 in damages, and her husband was awarded $0.

**{¶29}** On September 19, 2024, the magistrate entered judgment upon the jury verdict. On September 24, 2024, the trial court entered judgment consistent with the magistrate's entry. *See* Civ.R. 53(C)(2) (when the parties consent to the magistrate presiding at a jury trial, the trial judge shall enter judgment consistent with the magistrate's entry without reviewing or entertaining objections to legal rulings or the jury's factual findings).

**{¶30}** A timely notice of appeal was filed by Ciras, Inc. (hereinafter Appellant). After a limited remand from this court, the trial court granted a motion for prejudgment interest filed by Mary Schultz (hereinafter Appellee). (3/5/25 J.E.). The case was thereafter briefed and heard, but the appeal was stayed pending the decision of the Ohio Supreme Court in *L.H. v. Sun Secured Financing, L.L.C.,* 2026-Ohio-2219 *(*previously captioned *"[Minor's Name] v. Oakwood Village"*). Due to the Supreme Court's June 17, 2026 decision in *L.H.*, the stay in this case is lifted.

<u>ASSIGNMENTS OF ERROR ONE & TWO</u>

**{¶31}** Appellant's first two assignments of error involve the sufficiency of the evidence on the harborer element of the dog bite statute:

"The trial court erred in denying Ciras, Inc.'s motion for directed verdict. Ciras, Inc. never met the standard of 'harborer' under the law."

"The evidence was not sufficient to support the jury's verdict that Ciras, Inc. was a harborer."

**{¶32}** Appellee's sole claim at trial was for strict liability under the dog bite statute, which provides in pertinent part: "The owner, keeper, or harborer of a dog is liable in damages for any injury, death, or loss to person or property that is caused by the dog . . ." R.C. 955.28(B) (with exceptions not relevant here). Only the harborer element was at issue.

**{¶33}** Appellant moved for directed verdict under Civ.R. 50(A) at the close of Appellee's case in chief and renewed the motion at the close of all evidence. When such motion is made under the rule and the trial court "after construing the evidence most

strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue." Civ.R. 50(A)(4).

{¶34} Although we consider the evidence to determine whether the party with the burden of production set forth adequate evidence on every element of their claim, directed verdict motions "do not present factual issues but instead present questions of law." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 25. The direct verdict issue (in the first assignment of error) requires application of the same test applicable to an appellate argument on the sufficiency of the trial evidence to support a verdict (as raised in the second assignment of error). *See id*. at ¶ 11, 25. In other words, sufficiency is the legal standard evaluating both whether the case may be submitted to the jury and whether the evidence is legally sufficient to support the jury verdict. *Id.* at ¶ 11, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id*., quoting *Thompkins* at 386. There is no deference to a judge or jury on a question of law, such as sufficiency, which we independently review de novo. *Groob v. KeyBank*, 2006-Ohio-1189, ¶ 14; *State v. Guterba*, 2023-Ohio-2899, ¶ 25 (7th Dist.).

{¶35} The sufficiency evaluation (applicable to a denial of directed verdict or when raised for the first time on appeal[2]) is wholly distinct from a manifest weight of the evidence review. *Eastley* at ¶ 8-10, 15-17, 23 (confirming the distinct nature of sufficiency and weight in a civil case, in the same way the concepts are distinct in a criminal case, and rejecting the merger of the concepts employed by various courts). Manifest weight of the evidence is a test considering whether the party met their burden of persuasion (under the relevant standard of proof) by evaluating the credibility of witnesses and conflicts in the evidence in order to weigh the evidence of believability. *Id*. at ¶ 19. In weighing evidence, there is a presumption in favor of the fact-finder and the appellate

---

[2] We note although an argument on the failure to grant directed verdict at the close of the plaintiff's case can be waived if, for instance, a motion is not renewed, this has not been construed as a waiver of an appellate argument on the sufficiency of the evidence. *Chem. Bank of New York v. Neman*, 52 Ohio St.3d 204 (1990) (finding the directed verdict assignments were waived for failure to renew the motion but reviewing a different assignment of error construed as a sufficiency of the trial evidence argument).

court must be unanimous in order to reverse a jury verdict as being against the weight of evidence; whereas, sufficiency is a legal test reversible by a simple majority vote. *Id*. at ¶ 11, 18, 21; *see also Wagner v. Roche Labs.*, 77 Ohio St.3d 116, 119 (1996) ("it is well established that the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion").

**{¶36}** We distinguish weight here because Appellee's response to Appellant's second assignment of error addresses the manifest weight of the evidence. Although the table of contents in Appellant's brief mentions weight of the evidence, the text of the assignment of error in the body of Appellant's brief addresses only sufficiency of evidence, as do the arguments set forth under the assignment of error. There must be sufficient evidence in order for a verdict to be supported by the weight of the evidence. *Thompkins* at 388 (court can reverse on weight of the evidence only if there was first sufficient evidence).

**{¶37}** Before addressing the Supreme Court's recent pronouncement on a dog harborer, we outline the arguments. Appellant observes a person cannot harbor a dog without knowing of the dog's existence. *See Good v. Murd*, 2014-Ohio-2216, ¶ 11 (6th Dist.) (even if tenant's dog was on common area, landlord did not intentionally acquiesce to tenant's dog, and lease transfers possession and control in any event). Appellee says Appellant did not raise this below. However, Justin testified on his belief that his uncle lacked knowledge of the dog's existence, Mary Schultz opined in her testimony that Justin was probably incorrect on his uncle's knowledge, the motion for directed verdict said "even if" the court found acquiesce there was no possession or control of the property while Justin lived there, the plaintiff's closing argument specifically said the defendant was claiming they had no knowledge even if there was possession and control, and the defense's closing argument referred to the allegation of acquiescence in a condition at the property by noting silence "doesn't matter" if the property owner does not even know it is happening. Tr. 45, 74, 93-94, 214, 318, 329. Appellee also says Justin's testimony need not be believed while Appellant points to Appellee's failure to call a witness who could provide evidence on the question when Appellee had the burden as the plaintiff.

**{¶38}** In any event, Appellant argues acquiescence or knowledge of the dog was irrelevant because there was no evidence Ciras, Inc. had possession and control of the

property. Appellant asserts mere ownership of property does not define a harborer of a dog. It is emphasized that after Justin moved in, there was no indication Ciras, Inc. could admit or exclude other people from the residence. Appellant says the yard or curtilage of the single family home is to be presumed to be in Justin's possession and control. *See Young v. Robson Foods, Inc.*, 2009-Ohio-2781, ¶ 7 (9th Dist.) (lease transfers possession and control of the premises to the tenant and presumption single-family residence comes with possession and control of the entire lot, where it was a normal-sized parcel).

{¶39} Appellee says there was no landlord-tenant relationship due to the lack of monetary rent, the lack of a written agreement, the uncle's $10,000 assistance in making improvements, the answers in the bankruptcy petition, and the intent to let Justin buy the property in the future. Appellee suggests principles from cases involving a standard landlord-tenant relationship are irrelevant while Appellant suggests a property owner who does not occupy a house and who allows someone else to occupy it until they can purchase it later would be subject to the same principles.

{¶40} Appellee opines a single-family house with a yard in a city is distinct from a single-family house on rural property with a yard surrounded by fields. Appellee believes the fact that Justin's cousin entered the field to bale hay showed Ciras, Inc. had possession and control of all grounds. Yet, there was no testimony as to who gave the cousin permission. Justin was called in the plaintiff's case but never asked this question, and the plaintiff did not call the cousin, the uncle, or the president of Ciras, Inc. who represented the company as the party at trial.

{¶41} Appellee also claims a person cannot "draw fake lines" to establish the curtilage of a house. However, that is exactly what the law does in criminal cases speaking of curtilage and whether a defendant had a constitutionally protected privacy right. *See generally State v. Desarro*, 2026-Ohio-1672, ¶ 21-28 (7th Dist.) (reviewing cases indicating curtilage can include driveway and detached garage). The photographs and testimony (including the testimony of Mary Schultz) make it clear the dog was regularly kept in the curtilage of the house, not in any fields, and escaped from his chain very close to the house.

{¶42} We turn to the recent Supreme Court pronouncement in *L.H. v. Sun Secured Financing L.L.C.,* 2026-Ohio-2219, and the background of that case. In *L.H.,*

Case No. 24 MA 0091

the trial court granted summary judgment to a property owner on a strict liability claim that a resident's dog bit a child in the common area of a manufactured home community where dogs were permitted. The Second District reversed and remanded for trial after stating Ohio courts (and Ohio Jury Instruction 409.01) have consistently defined a dog's harborer as "someone who has possession and control of the premises where the dog lives and silently [or otherwise] acquiesces to the dog's presence." *L.H. v. Oakwood Village*, 2024-Ohio-5948, ¶ 14 (2d Dist.) (prior to amended case caption), quoting *Ward v. Humble*, 2022-Ohio-3258, ¶ 13 (2d Dist.), citing *Vallejo v. Haynes*, 2018-Ohio-4623, ¶ 15 (10th Dist.), citing *Hilty v. Topaz*, 2004-Ohio-4859, ¶ 8 (10th Dist.). The appellate court's majority used this definition to conclude a property owner who possessed and controlled a common area where residents were allowed to bring their leashed dog is legally a harborer while the dog was so leashed. *Id.* at ¶ 16.

{¶43} In a well-reasoned dissent, one of the appellate judges found the property owner was not a harborer as a matter of law because he did not exercise a sufficient responsibility, care, or control of the dog, calling for a stricter definition. *Id.* at ¶ 23-54 (Welbaum, J., dissenting). His review of appellate cases suggests the situation of a mere property owner (especially one who does not live with the dog) was not consistently considered a harborer due to acquiescence in the dog's residency and a lack of acquiescence to a dog running loose may be dispositive as well. *Id.* at ¶ 37-49; *see, e.g., Engwert-Loyd v. Ramirez*, 2006-Ohio-5468, ¶ 2-3, 9-10 (6th Dist.) (property owner leased single-family home to sister's family and let them keep a dog who bit the plaintiff in the back yard; property owner was not liable as a harborer because lease transferred possession and control); *Stuper v. Young*, 2002-Ohio-2327, ¶ 2-3, 17 (9th Dist.) (summary judgment to grandmother who owned a bar and a neighboring home where her grandson and his dog lived due to lack of evidence she had knowledge of or acquiesced to the dog roaming loose at bar parking lot); *Thompson v. Irwin*, 1997 WL 666079, *4 (12th Dist. Oct. 27, 1997) (summary judgment for trailer park owner where a dog attacked a child while it was running loose with no evidence the trailer park owner "permitted or acquiesced in the dog running loose" or was otherwise sufficiently involved with the dog to be labeled a harborer).

**{¶44}** Additionally, the dissenting appellate judge in *L.H. v. Oakwood Village* cited persuasive cases that did not involve a formal lease arrangement. *See id*. at ¶ 49, citing *Kovacks v. Le*wis, 2010-Ohio-3230, ¶ 3, 6, 34 (5th Dist.) (where *parents purchased a home for their daughter's family until financing could be obtained while knowing daughter had a dog* and the mother co-signed for dog's purchase but said she did not own it, the parents were not harborers and were not in possession or control of the premises when the dog bite occurred) and *Dilgard v. McKinniss*, 2024-Ohio-1106, ¶ 14-22 (3d Dist.) (where grandparents owned house where grandson *lived with a dog they knew he had and where he did not pay rent but maintained the house and paid utilities*, the court held the property owner's mere ability to control whether dogs are allowed is not sufficient to show a harborer).

**{¶45}** The Ohio Supreme Court accepted the property owner's appeal on the following two propositions of law:  (1) "The [appellate court] Erroneously Interpreted the Statutory Term 'Harborer,' Resulting in Both Clear Error and an Impermissible Expansion of the Scope of the Law" and (2) "The [appellate court's] Decision is Inconsistent with Chapter 955 (Dogs) as A Whole."  *L.H.*, 2026-Ohio-2219, at ¶ 7.

**{¶46}** Briefing on the second proposition pointed out the various statutes in Chapter 955 applicable to a dog's "owner, keeper, or harborer" should have a consistent definition of harborer, while opining it would be absurd to subject a property owner who does not live in the house with the dog owner and dog to statutes such as those dealing with registration or assessing costs for a seized dog.  *See* Apt.Br. in S.Ct. at 17-18 (7/7/25).  In the end, the Supreme Court found it did not need to reach the second proposition to find the property owner was not a harborer as a matter of law.  *L.H.* at ¶ 8.

**{¶47}** In sustaining the first proposition of law, the Supreme Court rejected the line of appellate court decisions defining a harborer as one with possession and control of the premises where the dog lives who acquiesces to the dog's presence.  *Id*. at ¶ 14.  The Court defined a haborer of an animal as one who is *actively* "sheltering, protecting, or exercising control over it."  *Id*. at ¶ 13-14, citing, *e.g.*, *Black's Law Dictionary* (3d Ed. 1933) ("To 'harbor' a dog involves the idea of protection, and of treating it as living at one's house, and undertaking to control its actions.").

**{¶48}** The Court concluded the property owner did not so shelter, protect, or exercise control over the dog by letting the dog owner live in a dwelling on the property with her dog and letting her bring the dog to the common area; rather, "[the dog owner] owned the dog, and she is the one who sheltered, protected, and exercised control over it." *Id*. at ¶ 15 (noting there was no evidence the property owner provided dog houses or dog food in common areas). As a matter of law, the property owner was not a harborer of the dog owned by a resident, and this is even true where the property owner expressly allowed the dog to live with a resident on the property and to be present at a common playground. *Id*. at ¶ 15-16. Accordingly, the Supreme Court reversed the appellate court and reinstated the trial court's grant of summary judgment for the property owner and against the dog bite victim who was not entitled to a jury trial on this legal issue. *Id*. at ¶ 2.

**{¶49}** A dissent composed of only two justices complained the majority opinion "upends decades of caselaw" wherein various appellate courts believed the focus for a harborer shifted from possession and control over the dog to possession and control over the premises where the dog resided, along with acquiescence (silent or otherwise). *Id*. at ¶ 18-23 (Fischer, J., dissenting). Notably, the dissent said this principle was previously applied in every district except our district. *Id*. at ¶ 21, fn. 1 (citing cases).

**{¶50}** Accordingly, we conclude R.C. 955.28(B) does not impose strict liability on the owner of a single family dwelling who does not live at the property and who allows a relative or potential purchaser to live at the property with a dog. This is true even if the existence of the dog is known and even if one were to speculate another person enters the fields by crossing the yard where the dog (according to Mary's own testimony) was regularly chained. To recap, the dog bit Appellee after escaping from a leash at the subject property where it lived. The dog lived with only: the registered dog owner; the dog owner's fiancé, who also described herself as the dog owner; and their minor children. The dog's owners were also the dog's keepers and harborers at the time of the bite. The dog did not live with the dog owner's uncle (whom the dog owner believed owned the property). Ciras, Inc., a company owned by the uncle's IRA, was the actual owner of the property, and the dog owner had no role at Ciras, Inc. A person's act of directing a company to purchase a house and to allow his nephew and family to take occupancy of

that unoccupied house does not make the property owner company strictly liable for a dog the sole occupiers may move onto the property (where that dog then breaks free from his collar/leash, runs to the street, and bites a neighbor who entered the property to return the dog).

{¶51} Even under the law prior to the recent Supreme Court decision, the evidence did not sufficiently show Appellant had possession and control of the house and yard and acquiesced to the dog's presence. Limited evidence was presented at trial. Any evidence presented in pretrial motions but not presented at the jury trial could not be considered in reviewing the sufficiency of the evidence presented at trial. The plaintiff did not call to the stand the uncle of the dog's owner or anyone else involved with Ciras, Inc. Moreover, the dog was not kept and did not escape from or begin his rampage from some alleged "common area" such as a field or back barn but from the yard of the single-family house occupied solely by the dog's owners. Even viewing the evidence in the light most favorable to the dog bite victim, there was no evidence produced at trial from which a reasonable juror could proceed to the next step involving a weighing of the evidence and the ascertainment of credibility.

{¶52} This conclusion is strongly reinforced by the principles within the Supreme Court's *L.H.* case, wherein the Court rejected the various appellate decisions holding landlords and other property owners strictly liable for dogs living with their owners on the property where they are allowed to be leashed outside. *L.H.* at ¶ 14 (in such cases, the plaintiff is not entitled to a jury trial, even when the property owner's express rules allow the resident's dog to be leashed in a common area); *see also L.H.* at ¶ 18-23 (Fischer, J. dissenting) (reviewing cases which are no longer good law based on the majority decision rejecting the underlying principles), citing, *e.g., Hill v. Hughes*, 2007-Ohio-3885, ¶ 17 (4th Dist.) (where a father let his son live on contiguous property and work for him). Upon the Supreme Court's pronouncement, we cannot apply old non-binding law from other districts. In the case before us, the property owner did not actively exercise control over the dog, protect the dog, treat it as living with the property owner, feed the dog or provide it a shelter separate from the dwelling where the dog owner resided (alone with his fiancé and children). *See id.* at ¶ 13-14. In accordance, Ciras, Inc. was not a harborer of Justin's dog as a matter of law. *See id*. at ¶ 15-16.

Case No. 24 MA 0091

**{¶53}** Consequently, Appellant would have been entitled to directed verdict as argued in the first assignment of error. In any event, because Appellant does not fit the definition of a harborer, the strict liability judgment was not supported by sufficient evidence, as argued in the second assignment of error, which we sustain.

<u>ASSIGNMENT OF ERROR THREE</u>

**{¶54}** Appellant's third and final assignment of error contends:

"The court should have granted Ciras, Inc.'s motion for summary judgment."

**{¶55}** This assignment of error need not be addressed as it is rendered moot by the ruling on the sufficiency arguments in the prior assignments of error. *Link v. FirstEnergy Corp.*, 2016-Ohio-5083, ¶ 22. In *Link*, the trial court denied motions by the defense for summary judgment, directed verdict, and JNOV; thereafter, the Supreme Court addressed sufficiency of the evidence under the JNOV denial after the jury verdict. *Id.* at ¶ 20-22. Before ruling the plaintiff failed to present sufficient evidence at trial, the Court ruled the denial of the defense motion for summary judgment was moot due to the subsequent jury verdict. *Id.* at ¶ 22, citing *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150 (1994), syllabus ("Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made"). This assignment of error is overruled as moot.

**{¶56}** For the foregoing reasons, the trial court's decision entering judgment on the jury verdict is reversed due to insufficient evidence on the required elements, and judgment is entered in favor of Appellant.

Hanni, J., dissents with dissenting opinion.

Dickey, J. concurs.

<u>Case No. 24 MA 0091</u>

Hanni, J., dissenting.

{¶57} With regard and respect to my colleagues, I must dissent from the Majority Opinion. I would affirm the trial court's entry of judgment in favor of Appellee in accord with the jury verdict.

{¶58} I acknowledge that the Ohio Supreme Court's recent holding in *L.H. v. Sun Secured Financing, L.L.C.*, 2026-Ohio-2219, ¶ 14, changed the definition of "harborer" under R.C. 955.28 to one who "actively shelter[s], protect[s], or exercise[s] control" over the dog. *Id.* at ¶ 17. However, I find the facts of the instant case distinguishable from *L.H.* and I agree with the dissenting Justices in *L.H.* that the legislature, not the court, is in the best position to either remove the term "harborer" from R.C. 955.28(B) or define it.

{¶59} In *L.H.*, the owner of the manufactured-home community was Sun Secured Financing, L.L.C. Sun had no connection with the dog owner, except that it owned the property where the dog and its owner lived. In the instant case, however, a familial connection exists. Ciras owns the property where Justin, his wife, their children, and their dog Rocky lived. Ciras is a company owned by Daniel Cadle's individual retirement account. Daniel Cadle is Justin Cadle's great uncle.

{¶60} Ciras purchased the property after Justin told his great uncle that he was interested in the property but could not afford to buy it. (Trial Tr. 69-70, 80). Justin and his wife had no lease or purchase agreement with Ciras and made no payments for the residence or property. (Trial Tr. 70-72, 75-76, 80-82). Ciras allowed the Cadles and Rocky to live on its property rent-free, thereby providing the shelter in which the dog lived.

{¶61} Further, Daniel Cadle gave Justin and his wife $10,000 to improve the property and Justin and his wife lived on the property under certain terms. (Trial Tr. 80-81, 86, 254-255). Justin's cousin also baled hay from the property and sold it with permission. (Trial Tr. 253). Daniel Cadle attested that he visited the property at least two times after Ciras purchased the property.

{¶62} Viewing these facts in a light most favorable to Appellee, Ciras not only sheltered Rocky, but protected him at the farmhouse and on the property and may have exercised control to require the Cadles to remove Rocky from the property. These facts distinguish the instant case from *L.H.* as the instant case shows the existence of something more than an unattenuated business relationship.

Case No. 24 MA 0091

**{¶63}** Aside from the differing facts, I also agree with the dissenting Justices that it is the role of the legislature, not the courts, to either remove the term "harborer" from R.C. 955.28(B) or to define it. As the dissenting Justices in *L.H.* observe, 11 of the 12 Ohio appellate court districts have relied on the prior definition of "harborer," and the definition has been applied since 1945. *Id.* at ¶ 21 (dissent). Even the Ohio Jury Instructions adopted the former definition. *Ohio Jury Instructions*, CV § 409.01 (Rev. Jan. 28, 2023). In addition, the legislature included the term "harborer" in the original enactment of the dog bite law in 1900, eliminated it in 1951, and then included it again when it amended R.C. 955.28 in 1987. *L.H.* at ¶ 19 (dissenting Opinion) (citations omitted). Thus, distinctions were made between the terms "owner," "keeper," and "harborer" and "harborer" was deliberately removed and added back into the statute. With this deliberate return of "harborer" to the statute, it appears the legislature was attempting to hold those liable for dog bites who were neither "owners" nor "keepers" of the dog.

**{¶64}** With such a rooted history, as well as the legislature's deliberate elimination and then re-inclusion of the term "harborer" into the statute, I believe it is best left to the legislature to decide the fate of the term.

**{¶65}** For these reasons, I would find that Ciras' assignments of error lack merit and I would affirm the trial court's judgment.

Case No. 24 MA 0091

_____

For the reasons stated in the Opinion rendered herein, the third assignment of error is moot and the remaining assignments of error are sustained. It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is reversed due to insufficient evidence on the required elements, and judgment is entered in favor of Appellant. Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**